**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.:**

Wertheim Jewish Education Trust, LLC,

        Plaintiff,

   vs.

Deutsche Bank AG; Deutsche Bank (Suisse) SA; Deutsche Bank Sociedad Anónima Española; and Deutsche Bank Private Wealth Management,

        Defendants.

_____/

**COMPLAINT**

Plaintiff, Wertheim Jewish Education Trust, LLC, ("The Trust"), by and through its undersigned counsel, brings this action against Defendants, Deutsche Bank AG, Deutsche Bank (Suisse) SA, Deutsche Bank Sociedad Anónima Española, (a/k/a "Deutsche Bank S.A.E."); and Deutsche Bank Private Wealth Management (collectively referred to as "the Deutsche Bank Defendants," "the defendant Banks" or "the Banks"), as follows:

**I.**      **INTRODUCTION**

1.    Plaintiff's basic claims against the Deutsche Bank Defendants are as follows:

(a) the Banks are refusing to return in excess of $3 billion that originated with Germany's most prominent philanthropic Jewish Families, the Wertheims of Frankfurt am Main;

(b) the Banks have refused to account for the interest and other benefits they earned and withheld from the rightful owners during the period that they have withheld the $3 billion from the Wertheim Heirs;

(c) the Banks have refused to cooperate with the heirs of the Wertheim Family Fortune

in the recovery and return of the monies that they are withholding from the rightful heirs, and thus preventing those heirs from using said funds for charitable and other purposes;

(d) the Banks have concealed, withheld and altered evidence in furtherance of their scheme to withhold the Wertheim Family Fortune from its rightful heirs;

(e) the Banks have violated various laws and their own internal operating rules as part of their scheme to withhold the Wertheim Family Fortune from its rightful heirs; and

(f) Deutsche Bank AG is refusing to return and/or account for the more than $ 3 billion that belongs to the Wertheim Heirs for the additional reason that has been and is technically insolvent, has debts, including the more than $ 3 billion that belongs to the Wertheim Heirs, that exceed its assets and it has under reported its reserves by billions of dollars.

2.     The complaint is based primarily upon a limited number of documents, referred to collectively as "the 2006 Credit Suisse Documents," which are identified and discussed in greater detail below. These Documents were obtained in May 2006 from Defendant Credit Suisse AG and which documents confirm the transfer of some of the monies entrusted to Credit Suisse AG, which Credit Suisse AG transferred to Deutsche Bank (Suisse) SA, a subsidiary of Deutsche Bank AG in Switzerland, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA, and which monies were known to be beneficially owned by the heirs of The Wertheim Family.  The 2006 Credit Suisse Documents are collectively attached hereto as **Exhibit 1.**

3.     At the time of the transfer, Deutsche Bank (Suisse) SA, Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, were on actual or constructive notice, and Deutsche Bank AG was on notice, as a result communications with the Deutsche Bank Defendants in Luxembourg, advising that the last remaining heir to the Wertheim Family fortune and the accounts and monies entrusted to its Bank had died, that an estate was

created and heirs appointed.

4.      The 2006 Credit Suisse Documents show that Deutsche Bank and its senior corporate officers, on behalf of Deutsche Bank AG and its wholly owned subsidiaries including but not limited to Deutsche Bank Sociedad Anónima Española ("Deutsche Bank S.A.E."), Deutsche Bank (Suisse) SA, and its departments including Deutsche Bank Private Wealth Management (hereinafter collectively referred to as "Deutsche Bank") have been involved with the transfer and withholding of more than $ 3 billion in assets and concealment of evidence and refusal to return the monies they are holding to the heirs of The Wertheim Family.

5.      The Plaintiff, as heir to the Wertheim Family Fortune, demands that Deutsche Bank AG, Deutsche Bank Sociedad Anónima Española ("Deutsche Bank S.A.E."), Deutsche Bank (Suisse) SA, and all its departments including Deutsche Bank Private Wealth Management, (i) return all the monies that it still holds that were transferred to it or any of its subsidiaries from Credit Suisse AG and which originated with and/or were beneficially owned by The Wertheim Family; (ii) account for all the interest and profits it made during the period when it has withheld the monies from the Wertheim Family Heirs; and (iii) produce an accounting of all accounts, including depository, investment, stock, savings, safe deposit, corporate, trustee and other accounts, and the interest or dividends earned in each account, commissions or fees paid on each account, transfers into and out of each account and annual balances on each account through to the present.

6.      The conduct of Deutsche Bank AG from 2012 to present violates the agreements they made with the United States Government (namely, the "Swiss Bank Program") requiring disclosure and production of the information related to the $3 billion in assets in accounts transferred from Credit Suisse to Deutsche Bank (Suisse) SA which agreement requires Credit

Suisse AG to disclose information about the $ 3 billion dollars in transferred assets that belong to the Wertheim Family that were in Credit Suisse AG accounts and which were transferred to Deutsche Bank and in which Plaintiff has an interest and must make a disclosure to the US Government and to other regulatory authorities[1] [2].

7.      Deutsche Bank AG and its subsidiaries, including Deutsche Bank (Suisse) SA, have pleaded to or been found guilty in US Federal Courts and been fined by the United States authorities in excess of $ 7 billion dollars for improper banking conduct, concealment and destruction of evidence. Such conduct demonstrates a course of conduct, improper operations and violations of normal and accepted banking procedures and, as such, are special and/or extraordinary circumstances for which Plaintiff should be entitled to equitable and injunctive relief to ensure that the $ 3 billion in withheld assets be returned, a full accounting be provided, and punitive and remedial actions be taken against Deutsche Bank AG and the other Defendant Banks to protect depositors and creditors[3].

8.      It is a matter of public knowledge that Deutsche Bank AG is in serious financial crisis, as was Lehman Brothers in 2008, and that a collapse of Deutsche Bank could be worse than Lehman Brothers[4]. Deutsche Bank's financial problems are, in part, the result of years of fines

---

[1]      See https://www.justice.gov/tax/swiss-bank-program  and https://www.irsmedic.com/2015/12/08/additional-swiss-bank-program-participants-announced/

[2]      See https://www.justice.gov/tax/swiss-bank-program and  https://www.justice.gov/opa/pr/justice-department-announces-deutsche-bank-suisse-sa-reaches-resolution-under-swiss-bank

[3] See http://www.law360.com/articles/731195/deutsche-unit-swiss-bank-ink-38m-doj-tax-evasion-deal and http://www.nytimes.com/2016/12/30/business/dealbook/deutsche-bank-flew-and-fell-some-paid-a-high-price.html?mwrsm=Email

[4]      See http://www.express.co.uk/finance/city/714881/Deutsche-Bank-collapse-could-it-be-worse-Lehman-Brothers-financial-banking-crisis-2008; http://www.dailymail.co.uk/news/article-3810869/Germany-s-banks-timebomb-crash-ll-2008-writes-ALEX-BRUMMER.html; http://cnafinance.com/the-next-financial-crisis-will-come-from-europe/11305; http://www.newyorker.com/business/currency/deutsche-banks-real-time-stress-test; and http://www.forbes.com/sites/francescoppola/2016/09/27/deutsche-bank-a-sinking-ship/#71c8f4933b9b

totaling billions of dollars by US and European regulators for, among other things, banking fraud, mortgage fraud, securities fraud, aiding and abetting tax evasion, money laundering, and manipulation of LIBOR rates.

9.     For example, on September 16, 2016, the United States Department of Justice imposed a fine of more than $14 billion against Deutsche Bank AG for its involvement in the 2008 real estate and banking collapse and recession, which Deutsche Bank AG just settled at the end of December 2016 by agreeing to pay $7.2 billion in fines and restitution[5] [6].  In a study to compare capital needs and leverage of 51 European banks using U.S. Federal Reserve stress test methods, published in July 2016 and conducted by German economic research Institute ZEW led by Finance Professor Sascha Steffen, working with New York University Stern School of Business and the University of Lausanne researchers, Deutsche Bank was found to have "the highest potential capital shortfall of 19 billion euros ($21 billion USD)"[7].

10.     According to a report from the International Monetary Fund, published in June 2016, Deutsche Bank AG is or may be the biggest contributor to "systemic risk" facing all European banks[8]. As such, Deutsche Bank's creditworthiness and ability to meet its debts are uncertain.  Therefore, the Plaintiff, as heir to the Wertheim Family Fortune, also demands that the Court appoint a receiver over Deutsche Bank AG to ensure that Deutsche Bank AG depositors and creditors, such as Plaintiff, can ultimately recover what is owed to them.

---

[5]     See http://www.usatoday.com/story/money/2016/09/16/deutsche-bank-justice-department/90467850/ ; http://fortune.com/2016/09/16/deutsche-bank-doj-mortgages-case/ and https://www.theguardian.com/business/2016/sep/16/deutsche-bank-must-pay-14bn-fine-to-settle-us-mortgage-case

[6]     See http://www.nytimes.com/2016/12/30/business/dealbook/deutsche-bank-flew-and-fell-some-paid-a-high-price.html?mwrsm=Email

[7]     http://www.reuters.com/article/eu-banks-tests-idUSL8N1AQ5AG

[8]     https://www.bloomberg.com/news/articles/2016-06-30/deutsche-bank-may-be-top-contributor-to-systemic-risk-imf-says

## II.        <u>DESCRIPTION OF THE PARTIES</u>

11.      Plaintiff, Wertheim Jewish Education Trust LLC (hereinafter "Plaintiff" or "Wertheim Trust") is a Florida not-for profit corporation, domiciled in the State of Florida and within the Southern District of Florida, whose directors and shareholders bring this claim to recover and account for the assets that belonged to Dr. Bäuml and the Wertheim Family and which are being withheld by the Defendant Banks.  The Wertheim Trust has the authority of, and is acting on behalf of, all lawful heirs to the Wertheim/Bäuml assets.  *See* **Exhibit 2** (entitled "Succession Tree Bäuml / Wertheim Trust"), and **Exhibit 3** (Copies of the Testaments and Notarial Deeds showing the rights to the return of the assets that are at issue herein).

12.      Defendant Deutsche Bank AG (hereinafter "Deutsche Bank") is the bank to which some Wertheim/Bäuml accounts and assets were transferred and which is in possession of and refuses to return or account for the assets belonging to Plaintiff and other heirs to the Wertheim/ Bäuml estate.

13.      Deutsche Bank is a banking institution principally incorporated in the Federal Republic of Germany, Taunusanlage 12, 60325 Frankfurt, Germany and is licensed as a foreign for profit corporation authorized to do business in the State of Florida, Document # F14000003903. Deutsche Bank AG maintains offices in Florida; has telephone fax and internet services in Florida; has employees in Florida; has a registered agent in Florida; advertises and solicits for its international banking business in and through the State of Florida for itself and its divisions or other wholly owned subsidiaries [such as Corporate Banking and Securities Division, Deutsche Bank Securities Inc. (separately registered to do business in Florida), Deutsche Bank Trust Company Americas (separately registered to do business in Florida), Deutsche Asset Management, Global Markets and Private, Wealth & Commercial Clients); maintains bank accounts and SWIFT

Codes for its Florida International Administrative Office for its Florida operations; and has interactive websites through which it conducts business in and through the State of Florida. Deutsche Bank has offices at 250 and 350 Royal Palm Way, Palm Beach and 600 Brickell, Miami, and maintains a registered agent located at 1200 South Pine Island Road, Plantation, FL  33324, within this jurisdiction and district. The business Deutsche Bank does within this jurisdiction and District includes the solicitation and maintenance of accounts for high net worth US citizens, including through the department of Deutsche Bank named "Deutsche Bank Private Wealth Management," which is also located in the United States and does business in Florida[9].

14.      Defendant Deutsche Bank (Suisse) SA is a banking institution principally incorporated in Switzerland and it is wholly owned subsidiary of and does business in the United States through Deutsche Bank AG.  Deutsche Bank (Suisse) AG solicits international banking business in and through the State of Florida through Deutsche Bank AG or one of its divisions

---

[9]      Deutsche Bank AG 2015 Declarations Pursuant to US Patriot Act of Financial Backing of Deutsche Bank (Suisse) SA: https://annualreport.deutsche-bank.com/2015/ar/supplementary-information/declaration-of-backing.html ; https://www.db.com/company/en/media/Deutsche-Bank-Branches-and-Selected-Subsidiaries-covered-by-the-Patriot-Act-Certification-of-Deutsche-AG.pdf ; http://www.law360.com/articles/731195/deutsche-unit-swiss-bank-ink-38m-doj-tax-evasion-deal ; https://www.irs.gov/businesses/international-businesses/foreign-financial-institutions-or-facilitators ; https://www.sec.gov/Archives/edgar/vprr/0000/0403/04039179.pdf; https://offshoreleaks.icij.org/nodes/11004486 ;
2002, 2009, 2014 & 2016 SEC / Deutsche Bank Suisse –
https://www.hunton.com/files/Uploads/Documents/lancer/Lancer_DE_2955.PDF,  http://www.secinfo.com/dsTQ1.sA1.htm; https://www.sec.gov/Archives/edgar/data/948046/000094804614000127/xslForm13F_X01/primary_doc.xml; http://www.secinfo.com/dsTQ1.w56.htm;
http://whalewisdom.com/filer/deutsche-bank-suisse-sa;
SEC Filing for Sale of Staples Securities by Deutsche Bank (Suisse) SA
http://investor.staples.com/mobile.view?c=96244&v=202&d=3&id=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTEwMTgyMzMmRFNFUT0xJlNFUT0xMyZTUURFU0M9U0VDVElPTl9QQUdFJmV4cD0mc3Vic2lkPTU3;
Deutsche Bank (Suisse) SA - Defendant in SDNY 2010 Case - https://dockets.justia.com/docket/new-york/nysdce/1:2010cv07774/369420;
Additional Misc. SEC Filings by Deutsche Bank Suisse –
http://us1.irabankratings.com/SEC/SEC_Listing.asp?yr=2016&cik=1342720&s=NT&b=;
http://www.ebf-fbe.eu/wp-content/uploads/2014/03/Money_Laundering_Nov02-2004-01934-02-E.pdf;
https://www.imf.org/external/pubs/ft/scr/2010/cr1078.pdf

(such as Corporate Banking and Securities Division, Deutsche Bank Securities, Deutsche Bank Trust Company Americas, Deutsche Asset Management, Global Markets and Private, Wealth & Commercial Clients); maintains bank accounts and SWIFT Codes in Florida; and has provided assistance and accounting services to clients in the United States. Defendant Deutsche Bank (Suisse) SA also does business in the United States by serving as a designated manager or agent or recipient of funds from United States companies, which activities are confirmed in filings with the Securities and Exchange Commission. Deutsche Bank (Suisse) SA has also voluntarily submitted to jurisdiction in the United States and to the Courts and regulatory authorities through the agreement entered into with the United States Department of Justice.

15.     Deutsche Bank Sociedad Anónima Española ("Deutsche Bank S.A.E.") is a wholly owned subsidiary of Deutsche Bank AG and does business in the United States itself and through Deutsche Bank AG.  Deutsche Bank S.A.E. solicits international banking business in and through the State of Florida through Deutsche Bank AG or one of its divisions (such as Corporate Banking and Securities Division, Deutsche Bank Securities, Deutsche Bank Trust Company Americas, Deutsche Asset Management, Global Markets and Private, Wealth & Commercial Clients); maintains bank accounts and SWIFT Codes in Florida; and has provided assistance and accounting services to clients in the United States.   Defendant Deutsche Bank S.A.E. also does business in the United States by serving as a designated manager or agent or recipient of funds from United States companies, which activities are confirmed in filings with the Securities and Exchange Commission. Furthermore, Deutsche Bank AG has entered into other written agreements and pledges with United States regulatory authorities, including under the US Patriot Act, through which it vouched for Deutsche Bank S.A.E. and pledged to honor its debts/solvency.  For purposes of this complaint and for all relevant time, Deutsche Bank S.A.E.'s involvement, liability and

accounting obligations to Plaintiff also results from its direct involvement and that of its Chief Legal Counsel, Luis Marimón Garnier, in meetings related to the transfer of the monies that are the subject of this complaint.

16.     Defendant Deutsche Bank Private Wealth Management is a division of Deutsche Bank AG, and does business in Florida itself and by using the services, offices, employees and agents of Deutsche Bank in Florida; telephone fax and internet services in Florida; employees in Florida. Deutsche Bank Private Wealth Management also has a registered agent in Florida; advertises and solicits for its international banking business in and through the State of Florida for itself and for other Deutsche Bank subsidiaries and divisions; it maintains bank accounts and SWIFT Codes for its Florida operations; and it has interactive websites through which it conducts business in and through the State of Florida. Deutsche Bank Private Wealth Management solicits and maintenance of accounts for high net worth US citizens located in the United States and in Florida.  For purposes of this complaint and for all relevant time, Deutsche Bank Private Wealth Management's involvement, liability and accounting obligations to Plaintiff also derive from its direct involvement and that of various of its attorneys, who periodically communicated with and were involved with the Banks' refusal to cooperate and account for, and concealment of, the transferred monies that are the subject of this Complaint.

**III.     THE CLAIMS ARE TIMELY**

17.     Plaintiff's demand for an accounting and the return of monies withheld from it by the Defendant Banks is timely.

18.     The Defendant Banks have engaged in improper conduct, including concealment of evidence and false statements designed to interfere with, and run out the clock on, Plaintiff's

ability to secure the return of the monies that are being withheld from it.[10]

19.     Plaintiff demands that Defendants provide an accounting and produce documents related to the accounts in which Plaintiff has an interest, so that it can comply with the requirements of Foreign Account Tax Compliance Act ("FATCA") Public Law 111-147 (111th Congress), Title V, Subtitle A, Sec. 501 et seq. by filing the necessary and required forms with the United States Tax Authorities, are timely.

20.     Plaintiff's Complaint for Pure Bill of Discovery is timely, so that claims can be made against additional individual entities and parties who are or may be holding monies or are the banks to which the monies were transferred from the Defendant Banks.

### IV.        JURISDICTION

21.     The Court has jurisdiction over Plaintiff's claims pursuant to 12 U.S.C. § 632, which provides jurisdiction over "suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States, or out of other international or foreign financial operations, either directly or through the agency, ownership, or control of branches or local institutions in dependencies or insular possessions of the United States or in foreign countries, shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits".

22.     The Court has jurisdiction over Plaintiff's claims pursuant 28 USC § 1332, which provides that district courts shall have original jurisdiction of all civil actions where the matter in

---

[10]  German law governs the ability of Plaintiff and other heirs to the estate of Dr. Bäuml – which is a German estate – and Plaintiff has until August 2, 2020 (thirty years from the date of death) by which to take all actions to secure the return/recovery of estate assets.

controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between (1) citizens of different States; (2) citizens of a State and citizens or subjects of a foreign state.

23.     The Court has jurisdiction to compel the Defendant Banks, and others, to produce the accounting and documents related to the foreign accounts in which Plaintiff has an interest, pursuant Foreign Account Tax Compliance Act ("FATCA") Foreign Account Tax Compliance Act ("FATCA") Public Law 111-147 (111th Congress), Title V, Subtitle A, Sec. 501 et seq., and pursuant to the agreements voluntarily entered into by Defendants through which they pledged to cooperate in the accounting for, and production of information related to, accounts in foreign banks in which United States citizens and residents, such as Plaintiff, have an interest and an obligation to report their interests to United States tax and other regulatory authorities. [11]

### V.     VENUE

24.     The Wertheim Jewish Education Trust LLC is a not-for-profit charitable corporation, incorporated in the State of Florida and domiciled within this District, at 6700 NW 44th Street, Fort Lauderdale, Florida 33319.

25.     The Defendant Banks maintain offices in Florida; have telephone fax and internet services in Florida; have employees in Florida; have a registered agent in Florida; advertise and solicit for its international banking business in and through the State of Florida; maintain bank accounts and SWIFT Codes for their Florida International Administrative Office for their Florida operations; and have interactive websites through which they conduct business in and through the State of Florida, including with this District; and  have otherwise consented to the jurisdiction of United States Courts with regard to claims under the Foreign Account Tax Compliance Act

---

[11]   See https://www.justice.gov/tax/file/631356/download - "Joint Statement between the United States Department of Justice and the Swiss Federal Department of Finance – known as the "Swiss Banks Programs".

("FATCA") and other related accounting claims.

26.   No single foreign court can exercise jurisdiction over all of the Defendant Banks in a single action and in a single location.

27.   United States Courts have an equal if not superior interest in addressing Plaintiff's claims, including ensuring that Defendants comply with the FATCA provisions.

28.   Foreign courts do not recognize many of Plaintiff's claims.

**VI.   FACTS RELEVANT TO PLAINTIFF'S CAUSES OF ACTION**

**A. Overview of the Wertheim Family and its Monies That Are Being Wrongfully Withheld.**

29.   The Wertheim Family is to German what the Rothschild family is to France.

30.   There were two branches to the Wertheim family, one originating in Berlin and the other in Frankfurt.  Both families were extremely wealthy.

31.   The family in Berlin was the founder of department stores, the most famous of which is KaDeWe—Germany's largest department store—which is comparable to Macy's in New York City and Harrods in London.

32.   The Wertheim family in Frankfurt – the Family of Joseph and Rosalie Wertheim (formerly Ballin of Germany's Hapag Lloyd family) -- built an empire around textiles and manufacturing equipment.

33.   A brief history of the family of Joseph Wertheim is set forth below.

**B.   Patriarch Joseph Wertheim**

34.   In 1862, Joseph Wertheim established the Wertheim Sewing Machine Company.

35.   From 1862 to 1875, Joseph Wertheim built his company into an international concern with businesses throughout Europe and Australia, with factories and sales worldwide.

36.   Joseph Wertheim was a philanthropist and was active in German politics.

37.    Joseph Wertheim was a member of the "Zentrum" party and a friend of Chancellor Otto von Bismarck.

38.    After the founding of his business, Joseph Wertheim built an empire that included sewing machine sales with an accumulated business volume/worldwide sales of approximately $ 2 billion USD.

39.    Joseph Wertheim introduced a new sewing machine type the "Electra" which became the best-selling sewing machine in the world.

40.    The Wertheim empire included land in the United States and art collections.

41.    The Industrial Empire as built by Joseph Wertheim is illustrated in the photograph attached hereto as **Exhibit 4**.

42.    Joseph and Rosalie Wertheim had 10 children; Ernst, Sophie, Martha, Paul, Karl, Lilie, Richard, Emmy, Franz and Elsa.  *See* **Exhibit 5** (Succession tree Wertheim–Bäuml).

43.    Joseph Wertheim died in 1899.

44.    At the time of his death, the Wertheim Sewing Machine Company had grown to multi-billion dollars per year business, with approximately 750 employees in Frankfurt Germany and with assets and property worldwide.

45.    The value of the Wertheim Family fortune at the time of Joseph's death can be objectively calculated based upon the will and distributions made by Joseph Wertheim.

46.    The distributions of Joseph Wertheim's estate were divided into two parts: Part 1 was cash payments to family members who would not inherit the corporate business and assets, to wit: (i) immediate surviving family members received the combined sum of $ 53,662,500.00 (specifically 3,975,000 Goldmarks – conversion rate is 1 Goldmarks = 13.5 USD); (ii) grandchildren received what was called a "apenash" or "pension" with the equivalent combined

value of $ 121,500,000.00); and (iii) the combined cash distributions to family members as of 1899 were in excess of $ 175,162,500.   Part 2 was the business which was left in its entirety to Karl Wertheim.

47.     At the time of his death, the value of Joseph Wertheim's corporate empire was in the hundreds of millions of dollars, as of 1899.

### C.  The Wertheim Family Business Expansion from 1900s to the Nazi Regime

48.     The fate of children of Joseph Wertheim was the same as that of other Jewish children during the Nazi Regime and the Holocaust.  Those who could flee Germany did and those who were unable to get out were murdered by the Nazis.  Specifically, the fate of the 10 children was: (i) Ernst Wertheim committed suicide before the Nazis took him; (ii) Sophie, Lilie, Emmy, Elsa and Karl Wertheim survived the Holocaust by fleeing Germany; and (iii) Martha, Paul, Richard and Franz Wertheim were murdered by the Nazis.

49.     Karl Wertheim left Germany very early.  In the 1920s, Karl saw the rise in anti-Semitism in Germany and relocate the family and move its major business interests to Spain.

50.     In Spain, to avoid being discovered by the Germans, Karl Wertheim assumed the name of Carlos Vallin Ballin (the surname of his mother's family).

51.     During this relocation of the company and its businesses to Spain, Karl Wertheim also relocated the financial assets to Switzerland.

52.     It was then that Karl Wertheim started his relationship with Schweizerische Kreditanstalt (SKA), predecessors to today's Credit Suisse AG.

53.     In 1931, before the rise of the Nazi Regime, Karl Wertheim opened an account at Credit Suisse Zurich.  *See* **Exhibit 6.**

54.     In 1939, at the beginning of World War II and in accordance with the Nuremburg

laws, Karl Wertheim informed the Franco Regime in Spain of the monies he and his companies had at Deutsche Bank and Credit Suisse.  *See* **Exhibit 7**.

    D.  **The Wertheim Assets from 1930s to Death of Karl Wertheim in 1945**

55.    During the period from the 1930s to 1945, the sewing machine company assets were protected by having them hidden in Swiss Bank accounts.

56.    The Wertheim Family assets were moved from The Wertheim Sewing Machine Company, to Rapida S.A, and then parts of it onwards to Hispano Olivetti S.A.

57.    The families' assets did not decrease and were shielded from the Nazis.

58.    The primary custodian of the Wertheim Family assets was Credit Suisse AG.

59.    The assets were held at Credit Suisse AG, or its predecessors, in the following types of accounts: secret/numbered or pseudonym accounts, trust accounts held in the name of third parties but as to which the Wertheim Family were identified as the beneficial owners, including account numbers and pseudonym references.

60.    The Secret / Numbers used on for some accounts at Credit Suisse were (i) ****-***.794 – master account;[12] (ii) ****-***.794-0; (iii) ****-***-794-01– Swiss Francs account; (iv)****-***.794-02-1 – US Dollar account; (v) ****-***.794-02-4 – Deutsche Mark account; and (vi) Ge22 2238/em (Credit Suisse's internal reference to Wertheim accounts). *See* **Exhibit 8.**

61.    The Pseudonyms used for some accounts at Credit Suisse were (i) Juan de Pages (Karl Wertheim); (ii) Delores de Pages (Maria Wertheim) and (iii) Manuel de Pages (Dr. Bäuml).

62.    The names of the beneficial owners of all the accounts and assets held by Credit Suisse during the period from the 1930s to the death of Karl Wertheim in 1945 included (i) Karl

---

[12]    The account numbers have been redacted, but are available to Court for a *en camera* review. They will also be provided to defendants' counsel in discovery.

Wertheim a/k/a Carlos Vallin Ballin; (ii) Maria Wertheim a/k/a Maria Vallin Ballin; (iii) Hispano Olivetti SA; (iv) Hispano Olivetti Office SA; (v) Interwiko AG; and (vi) Intertrade Development & Finance Ltd.

    **E.**  **Dr. Ambrosius Wolfgang Bäuml Becomes Heir to Karl & Maria Wertheim**

63.    Karl and Maria Wertheim did not have any children of their own.

64.    In a biblical tradition, Maria Wertheim asked her sister – Viktoria Bäuml (whose husband died during World War I) – if she would sire a child with Karl Wertheim.

65.    Karl and Maria agreed to pay for the child's education, to support Viktoria and to help her raise the child.  And, upon Maria's death, the child would be formally adopted and become the sole heir to the Wertheim fortune.

66.    Viktoria agreed and the child born out of this union was Dr. Ambrosius Wolfgang Bäuml ("Dr. Bäuml").

    **F.**  **Karl Wertheim Dies in 1945 and Maria Wertheim Becomes Sole Heir, <u>Introducing Dr. Ambrosius Wolfgang Bäuml to Management of Assets</u>**

67.    In 1945, Karl Wertheim died and his entire estate passed to Maria Wertheim.

68.    From 1945 until the early 1970s Maria Wertheim was the sole manager of the Wertheim Family fortune and their assets.

69.    By this time, the Wertheim Family fortune included the ongoing worldwide sewing and office machine business of Hispano Olivetti S.A., bank accounts in Swiss Banks, investment portfolios in Swiss Banks, land in Europe and the United States and art collections.

70.    The art collections were held in a foundation that was created for the Wertheims by using Credit Suisse Trust – which is also a part of Credit Suisse AG.

71.    By the mid 1950s, because of deterioration of Maria Wertheim's health, she started to slowly introduce Dr. Bäuml to the management of the Wertheim Family fortune.

72.     The assets held by Credit Suisse during the period from 1945 until 1976 were held in the following types of accounts: secret/numbered or pseudonym accounts where the Wertheim Family were identified as the beneficial owners of (i) ****-***.794 – master account; (ii) ****-***.794-0; (iii) ****-***-794-01– Swiss Francs account; (iv) ****-***.794-02-1 – US Dollar account; (v) ****-***.794-02-4 – Deutsche Mark account; and (vi)  **** 2238/em (Credit Suisse's internal reference to Wertheim accounts).

73.     The assets held by Credit Suisse during the period from 1945 until 1976 in the above-referenced secret/numbered accounts were also known by the pseudonyms of (i) Juan de Pages (Karl Wertheim); (ii) Delores de Pages (Maria Wertheim) and (iii) Manuel de Pages (Dr. Bäuml), as the listed names/owners on the accounts.

74.     During the Nazi Regime, the names on the accounts at Credit Suisse were concealed from the Nazis but known to Credit Suisse.   "Riaval E." was the pseudonym for the Wertheim accounts where Marimón Griffel was named as the trustee.  This pseudonym was also used to identify the shareholders of "Rapida" accounts.  Credit Suisse knew that these pseudonyms were for accounts owned or beneficially owned by the Wertheims and after the war and after Karl's death everything went to Maria Wertheim.

75.     The names of the beneficial owners of all the accounts and assets held by Credit Suisse during the period from 1945 until 1976 included: (i) Karl Wertheim a/k/a Carlos Vallin Ballin; (ii) Maria Wertheim a/k/a Maria Vallin Ballin; (iii) Hispano Olivetti SA; (iv) Hispano Olivetti Office SA; (v) Interwiko AG; and (vi) Intertrade Development & Finance Ltd.

76.     During the period from 1945 until 1980, the name Don Federico Marimón Griffel ("Griffel") – personal counsel to Karl & Maria Wertheim – was listed as the Trustee/Nominee whose name appeared on the above referenced accounts (including those identified by numbers or

the pseudonym Riaval E.) at Credit Suisse AG, in order to conceal the identities of the true owners of the accounts, i.e., the Wertheim Family.

77.     In 1959, Maria Wertheim wrote to Credit Suisse to inform it that Dr. Bäuml now had a general power of attorney over all the Wertheim Family accounts. *See* **Exhibit 9.**

78.     Maria Wertheim was respected in her own right as a successful businesswoman and philanthropist.

79.     Maria Wertheim was a friend of Dr. Herman Josef Abs, former CEO of Deutsche Bank AG.

80.     Maria Wertheim helped the cities of Frankfurt and London with post-war reconstruction and debt repayment and, in gratitude for the Wertheim Family help to England, she was welcomed and thanked by Queen Elizabeth.

81.     From the late 1950s until the early 1970s, Maria Wertheim took her "adopted" son, Dr. Bäuml with her on trips around the world to manage the Wertheim Family fortune.

82.     These trips included trips to (i) Zurich and Baden, Switzerland and Vaduz, Lichtenstein, where she and Dr. Bäuml visited the banks at which the family's assets were held, and (ii) the United States. [13]

83.     In 1960, shortly after Maria Wertheim brought Dr. Bäuml to assist her with the management of the Wertheim Family fortune, he made diary entries with calculations of the principal and annual return on Family investment accounts. These calculations showed principal and annual distributions as follows:

| Date: | Financial Asset / Principal | 3 % Distribution |
|---|---|---|

---

[13]   The trips were recorded in the handwritten diaries of Dr. Bäuml.

|  |  |  |
|---|---|---|
| 25-06-1960 | 49,339,383.00[14] | 1,480,181.00 |
| 05-09-1960 | 33,497,192.00 | 1,004,155.00 |
| 09-11-1960 | 33,333,780.00 | 1,013,000.00 |
| 13-01-1961 | 28,411,828.00 | 825,355.00 |

*See* **Exhibit 10.**

*84.*    Therefore, the total as of 1961 in the Wertheim Family accounts, as recorded by Dr. Bäuml in his diary (from 1961), was 144,582,183.00 (in US Dollars). *Id.*

85.    Applying a blend of the most conservative interest rates, inflation and market appreciation, per the DAX (18.37 multiplier) and Dow Jones (24 multiplier) to the figure of approximately 144,000,000 Swiss Francs that was recorded as being in the Wertheim Family accounts as of 1961, the current value of the Wertheim Family Fortune in just these accounts is $3,072,742,385,62 - -more than $ 3 billion Swiss Francs – as of 2016.[15]

86.    Dr. Bäuml and Maria Wertheim visited Credit Suisse in Zurich and Credit Suisse Trust in Vaduz together on March 31 and August 5, 1962.

---

[14]   This currency denominations are in USD.

[15]   The exact amount held on the trust accounts of Dr. Bäuml was found in his personal diary of the year 1961; the amount was in total 144,582,183.00 Million (USD). The account currencies maintained by Dr. Bäuml were in Swiss Francs, German marks and US Dollars. For ease of calculation in this complaint, only US dollars are used for the calculation of the currency values in the accounts. With an investment in American stocks listed in the Dow Jones Index, the following calculation can be made: (i) The Dow Jones index in 1961 amounted to a value of 731.14 (Source: Dow Jones Industrial Average, Wikipedia), if one assumes a value today of the Dow Jones of 18,000, this would result in a conservative multiplier from 1961 until today in the amount of 24.62 times; (ii) Multiplying the output value of 144,582,183.00 million with 24.62 times, we obtain a current market value of USD 3,559,631,345.00 Billion; (iii) Assuming an investment in German equities, as listed in the German stock index (DAX) results, which was at a value in 1961 in the amount of 489.79 (source: Wikipedia DAX); (iv) Assuming a current value of the DAX of 10,000, the DAX has increased from 1961 until today 20.417 times; (v) Multiplying the output value of 144,582,183.00 to the 20.417 times, we obtain a current market value of USD 2,951,934,430.00 Billion; (vi) In the calculation of the current market value, it is assumed that the generated and distributed dividends are not reinvested, which is very unlikely, we assume that the dividends were just taken out of the calculation and not reinvested for additional profit; and (vii) if the dividends would have been reinvested over the period of time, then the current market value would have increase far more significantly.

87.    Dr. Bäuml again went to the Credit Suisse offices in Zurich, and Credit Suisse Trust offices in Vaduz, in or about March 27, 1962.

88.    During the period after Dr. Bäuml was added to the accounts, Credit Suisse and Credit Suisse Trust knew that Dr. Bäuml had an interest in and/or was a co-owner and/or the co-beneficial owner (with Maria Wertheim) of the Wertheim Family accounts.

**G.  Maria Wertheim Dies in 1976 and Dr. Ambrosius Wolfgang Bäuml Becomes <u>Sole Heir to Wertheim Family Fortune – Management of Assets 1976 to 1990.</u>**

89.    Maria Wertheim died November 16, 1976.

90.    The will of Maria Wertheim left all the Wertheim Family assets and fortune to Dr. Bäuml.

91.    After Maria Wertheim's death, Dr. Bäuml continued to manage the Wertheim Family fortune.

92.    Credit Suisse knew that the Wertheim Family assets and accounts that were once owned by Maria Wertheim were now the sole property and assets of Dr. Bäuml.

93.    As of the date of Maria Wertheim's death, Credit Suisse AG still held secret/numbered or pseudonym accounts where the Wertheim Family continued to be identified as the beneficial owners of accounts including but not limited to (i) ****-***.794 – master account; (ii) ****-***.794-0; (iii) ****-***-794-01– Swiss Francs account; (iv) ****-***.794-02-1 – US Dollar account; (v) ****-***.794-02-4 – Deutsche Mark account; and (vi)  **** 2238/em (Credit Suisse's internal reference to Wertheim accounts). *See* Exhibit 8.

94.    As of the date of Maria Wertheim's death in 1976, the above-referenced secret/numbered accounts continued to be known at Credit Suisse AG by the pseudonyms of (i) Juan de Pages (Karl Wertheim), (ii) Delores de Pages (Maria Wertheim), and (iii) Manuel de Pages (Dr. Bäuml), as the listed names/owners on the accounts.

95.     As of the date of Maria Wertheim's death in 1976, the names of the beneficial owners of all the accounts and assets held by Credit Suisse during the period from 1945 until 1976 continued to be listed as including (i) Karl Wertheim a/k/a Carlos Vallin Ballin; (ii) Maria Wertheim a/k/a Maria Vallin Ballin; (iii) Hispano Olivetti SA; (iv) Hispano Olivetti Office SA; (v) Interwiko AG; and (vi) Intertrade Development & Finance Ltd.

96.     During the period from 1945 until 1980, Griffel continued to be listed as the Trustee/Nominee and appeared on the above referenced accounts, including the accounts with the pseudonym "Riaval E," at Credit Suisse AG, to conceal the identities of true owners of the accounts – the Wertheim Family.

97.     After Maria Wertheim's death in 1976 and after Griffel's death in 1980, the names on the trust accounts held at Credit Suisse AG, relating to the names of the beneficial owners of the Wertheim Family assets, were changed from Don Federico Marimón Griffel to (i) Federico Marimón Garnier ("F. Marimón"), the son of Griffel and joint power of attorney for Wertheim assets until 1983, and (ii) Luis Marimón Garnier  ("Luis Marimón"), the son of Griffel, who was also Secretary, board member and Chief Counsel of Deutsche Bank Spain, the executor of Maria Wertheim will, secretary and board member of Hispano Olivetti and later Olivetti Espana, and the holder of the power of attorney for the Wertheim Estate from 1983 until death of Dr. Bäuml.

98.     In addition to the services provided in relation to the accounts at Credit Suisse, in 1977, Luis Marimón, as trustee for Bäuml, helped manage an account at Banco Aleman Transatlantico (predecessor to Deutsche Bank S. A. E.) for the Wertheim Family. Certain monies were deposited into this account from the sale of real estate, including the house of Maria Wertheim and the factory buildings of Rapida SA (one of Wertheim's companies), which were transferred after Maria Wertheim's death.

99.     On March 30 and April 7, 1982, Dr. Bäuml visited Credit Suisse offices in Zurich and Credit Suisse Trust offices in Vaduz.

100.     From 1982 forward, Credit Suisse knew that Dr. Bäuml was the sole beneficial owner of all the relevant accounts it held, regarding which the Marimóns continued to hold Powers of Attorney.

101.     From the death of Griffel until September 1983, Credit Suisse AG was informed and knew that both Federico Marimón and Luis Marimón were given Power of Attorney to help manage the Wertheim Family assets and accounts under the heading of ***794, with Credit Suisse's internal reference to **** 2238 (which are the Wertheim/ Bäuml accounts).  *See* **Exhibit 11.**

102.     On September 26, 1983, Federico Marimón and Luis Marimón went with Dr. Bäuml to Credit Suisse AG offices in Geneva to make a change in the Powers of Attorney, whereby Federico Marimón gave up his powers and Luis Marimón alone continued to hold the Powers of Attorney to help manage the Wertheim Family assets and accounts under the heading of ***794. *See* **Exhibit 12.**

103.     On September 26, 1983, Luis Marimón met with Credit Suisse AG officers in Geneva to confirm that he also held the Power of Attorney to help manage the Wertheim Family debentures, bonds, stocks, precious metals and short-term money and money market accounts held in Swiss Francs and US Dollars under the heading of ***794.  *See* **Exhibit 13**.

104.     On September 26, 1983, Marimón met the Credit Suisse AG officers in Geneva and directed that all the correspondence related to all the Wertheim Family accounts be kept at the bank and not sent to the beneficial owner or trustee.  *See* **Exhibit 14**.

105.     During his meetings with Credit Suisse Officers in Geneva, and a part of the banks

internal documentation regarding the identification and nationality of the Trustee Marimón used an Andorran passport, not his Spanish passport of Spanish identity cards. *See* **Exhibit 15**.

106.    On November 4, 1986, Luis Marimón met with Credit Suisse AG officers in Geneva to confirm that he also held the Power of Attorney to help manage the Wertheim Family debentures, bonds, stocks, precious metals and short-term money and money market accounts held in Swiss Francs and US Dollars under the heading of ***794.  *See* **Exhibit 16.**

107.    On November 16, 1989, Luis Marimón met with Credit Suisse AG officers in Geneva to re-confirm his Power of Attorney Mandate (Identified as NG 76 / 3539) regarding the assets held in the account R.***.794-05 and management of the Wertheim Family general debentures, bonds, stocks, precious metals and short-term money and money market accounts held in Swiss Francs and US Dollars under the heading of ***794.  *See* **Exhibit 17.**

108.    During the entire period from the 1976 until 1990, Credit Suisse knew that the Wertheim Family Fortune, assets and accounts were held in its bank and included secret/numbered and pseudonym accounts and trustee accounts for which the beneficial owners of accounts including but not limited to (i) ****-***.794 – master account; (ii) ****-***.794-0; (iii) **\*\*\*\*- \*\*\***-794-01**– Swiss Francs account; (iv) ****-***.794-02-1 – US Dollar account; (v) **\*\*\*\*- \*\*\***.794-02-4** – Deutsche Mark account; and (vi)  **** 2238/em (Credit Suisse's internal reference to Wertheim accounts) (*See* Exhibit 8); and other accounts where Dr. Bäuml  (as the owner and successor to the accounts of Karl Wertheim a/k/a Carlos Vallin Ballin, Maria Wertheim a/k/a Maria Vallin Ballin, Hispano Olivetti SA, Hispano Olivetti Office SA, Interwiko AG and Intertrade Development & Finance Ltd.).

### H.  July 25, 1990 Dr. Bäuml Executed a Will and left the Wertheim Family Fortune to Rudolf and Giselheide-Eichammer Sutor.

109.    Dr. Bäuml became very sick and had to be hospitalized in the summer of 1990.

110.     Prior to that, through his relationship with the German School in Barcelona, Dr. Bäuml had become very close to Rudolf Sutor and Giselheide Eichammer-Sutor.

111.     Rudolf Sutor was a teacher at the German School in Barcelona, and Giselheide Sutor was an outgoing person widely respected within the community.

112.     Dr. Bäuml and the Sutors shared many things in common, particularly their commitment to education, the arts and the love of their German heritage.

113.     During their friendship, Dr. Bäuml confided in the Sutors about the Wertheim Family fortune and what he wanted to do with the assets, namely, donate monies to Jewish education and other worthy causes.

114.     Dr. Bäuml also told the Sutors of the diaries that he kept, which, as he explained, contained the information about banks, accounts, property, corporate holdings and other important information related to the Wertheim Family fortune.

115.     Dr. Bäuml often invited the Sutors to his home in Finca San Francisco.  Dr. Bäuml kept some of the art that was not on permanent loan to the Prado in Madrid or the Museo Nacional in Barcelona in a large acclimatized safe room in Finca San Francisco.

116.     The Sutors became aware of the vast wealth and holdings that Dr. Bäuml owned as the sole heir to the Wertheim Family fortune.

117.     Unbeknownst to the Sutors, after Dr. Bäuml was hospitalized, he had a will created on July 25, 1990 in which he named the Sutors as his sole heirs.  *See* **Exhibit 18.**

118.     On July 25, 1990, Dr. Bäuml gave Mrs. Sutor a Power of Attorney.  *See* **Exhibit 19.**

119.     Dr. Bäuml died on August 2, 1990 in a hospital in Burghausen, near Munich Germany.

120.   The will naming the Sutors as heirs was contested in a court proceeding.

121.   After a trial, the will was upheld and the Sutors were appointed as the sole heirs to the Wertheim Family fortune.

122.   The Bäuml Estate was created by Judgment and Order dated May 22, 1991, signed by Judge Schmied, a Judge of the Local Court, in the proceeding in the Amtsgericht of Altotting (Burghausen Branch) Reference # VI 259/90.   *See* **Exhibit 20.**

123.   The Sutors were appointed as the sole heirs to The Bäuml Estate.

I.   **Efforts by Sutors from August 1990 to January 1993 to Locate and Recover Wertheim Family Assets & Accounts, and Interference by Deutsche Bank**

124.   In 1990, after learning of Dr. Bäuml's death and his will appointing them as heirs, the Sutors wrote to the Banks they knew of from Dr. Bäuml's diary, notifying them of Dr. Bäuml's death and of the pending estate case in Germany. The Sutors also told the Banks to freeze the accounts and assets until the German Court issued its order designating the name of the person to whom the accounts should be turned over.

125.   In 1990, Deutsche Bank AG and several of its subsidiaries, were among the banks which were informed of Dr. Bäuml's death and the need to freeze accounts in their possession as to which Dr. Bäuml was the owner or the beneficial owner.

126.   After receiving the German Court order appointing them as the lawful heirs to The Bäuml Estate, the Sutors sent follow-up letters to banks and others in their efforts to identify, collect, locate and recover the assets of The Bäuml Estate from the accounts related to the Wertheim Family Fortune.

127.   Unbeknownst to the Sutors, on November 2, 1990 shortly after Bäuml's death, Marimón went back to Credit Suisse in Geneva to "re-verify" his authority over the accounts. Credit Suisse concealed from the Sutors the fact that this meeting took place and that at the meeting

Marimón "re-verified" his authority over the accounts, and that transactions should be restricted to US Dollars, all of which occurred after Bäuml's death.  *See* **Exhibit 21**

128.    From Dr. Bäuml's property, the Sutors recovered records (including the diary of Dr. Bäuml) that identified some of the banks where the accounts and assets were located.

129.    Starting in 1991, the Sutors wrote to all Banks identified in Dr. Bäuml's diary, and notified the banks of Dr. Bäuml's death, provided them with a copy of the German Court's Order that appointed them as sole heirs, and demanded that the Banks turn over the accounts to them.

130.    Some Banks, including a Deutsche Bank branch in Luxembourg, acknowledged the existence of accounts belonging to the Wertheim Family and/or the Estate of Dr. Bäuml.   Prior to his death, Dr. Bäuml told the Sutors that the money he had in this bank – which was about $2 million USD - was "pocket money" and not comparable to the large assets held by his trustee bank in Switzerland.

131.    On June 17, 1992, the Sutors and their Swiss lawyer met with Credit Suisse AG in Zurich.

132.    At the June 17, 1992 meeting with Credit Suisse, the Sutors presented Credit Suisse's officers, directors and lawyers with the German Court's Inheritance Certificate and the Apostille confirmation that the assets of Estate of Dr. Bäuml and the assets of the Wertheim Family now belonged to the Sutors as heirs to the Estate of Dr. Bäuml.  *See* **Exhibit 22.**

133.    Also, at this June 17, 1992 meeting with Credit Suisse, the Sutors demanded information about bank accounts at Credit Suisse under the name of Dr. Bäuml, the Wertheims, or the companies, and the secret or pseudonym accounts in which Dr. Bäuml and/or the Wertheims were the beneficial owners.

134.    Starting with this June 17, 1992 meeting, Credit Suisse concealed from the Sutors

the facts and evidence related to Luis Marimón's meetings with Credit Suisse officials in Zurich and Geneva regarding the secret and numbered accounts at Credit Suisse in Geneva and the management of the Wertheim Family general debentures, bonds, stocks, precious metals and short-term money and money market accounts.

135.    Starting with the June 17, 1992 meeting, Credit Suisse concealed the following documents and evidence from the Sutors: (i) the November 2, 1990 meeting between Luis Marimón and Credit Suisse officers in Geneva in which Luis Marimón "re-confirmed" his Power of Attorney Mandate over the Wertheim Family/Bäuml accounts at Credit Suisse three months after Dr. Bäuml's death; (ii) Credit Suisse's 1991 cooperation with transfer of assets from Credit Suisse accounts to Banco Transatlantico Espana accounts, which accounts were held at Credit Suisse and on which Wertheim and/or Bäuml were listed as beneficial owners, including from Hispano Olivetti SA and real estate proceeds; and (iii) the March 23, 1992 meeting between Luis Marimón and Credit Suisse AG in Geneva regarding the Wertheim Family Master Account, the investment strategy and assets held in the secret numbered accounts at Credit Suisse and management of the Wertheim Family general debentures, bonds, stocks, precious metals and short-term money and money market accounts. *See* **Exhibit 23**

136.    Starting with the June 17, 1992 meeting, Credit Suisse denied any relationship to or accounts belonging to or to which a beneficial ownership existed with Dr. Bäuml, Karl or Maria Wertheim, or any of their companies.

137.    Starting with the June 17, 1992 meeting, Credit Suisse also denied its ongoing meetings and cooperation with Luis Marimón regarding the transfer of assets in the accounts belonging to or to which a beneficial ownership existed with Dr. Bäuml, Karl or Maria Wertheim, or any of their companies.

138.    In 1990, shortly after Dr. Bäuml's death, the Sutors wrote Deutsche Bank AG to inform it of Dr. Bäuml's death and of their designation as sole heirs in Dr. Bäuml's July 25, 1990 will. They demanded that Deutsche Bank acknowledge that they were the lawful heirs in Dr. Bäuml's will.

139.    In response to the notification by the Sutors, the only response received from any Deutsche Bank entity was from Deutsche Bank Luxembourg SA (which operates as a part of Deutsche Bank Wealth Management).  Deutsche Bank Luxembourg notified the Sutors that had an account – account number ***760 -- in the name of Dr. Bäuml, and that they would freeze the monies in that account and turned such funds over to the heirs as soon as the German Court's confirmed the July 25, 1990 will.

140.    Deutsche Bank failed to acknowledge the existence of any accounts at any other Deutsche Bank entity, subsidiary or division, including (i) Banco Commerciale Transatlantico in Barcelona (predecessor to Deutsche Bank Spain), and (ii) Deutsche Bank (Suisse) SA in Geneva.

141.    In May 1992, a meeting was convened with the Sutors, Luis Marimón and Deutsche Bank Spain officials at their offices in Barcelona.

142.    At the May 1992 meeting, Deutsche Bank officials concealed the creation of accounts into which Luis Marimón transferred assets that originated with the Wertheim Family, Dr. Bäuml and/or their businesses (Hispano Olivetti SA and real estate holdings).

143.    Between May 1992 to January 1993, Deutsche Bank concealed from the Sutors facts relating to the creation/designation of account ****12 INT at Deutsche Bank (Suisse) SA that had been authorized by Diehr and Espinosa and into which the monies from the Wertheim Family or Dr. Bäuml's secret, numbered, pseudonym and/or beneficially owned accounts were transferred from Credit Suisse.

144.     During the period from June 17, 1992 until January 25, 1993, Deutsche Bank officials, including Pierre Diehr and Jairo Espinosa (both Vice CEOs at Deutsche Bank (Suisse) SA), concealed evidence from the Sutors and cooperated with Luis Marimón in the transfer of assets that were still at Credit Suisse including account beneficially owned by Dr. Bäuml and then his heirs, including accounts (i) ****-***-794-01– Swiss Francs account; (ii) ****-***.794-02-1 – US Dollar account; (iii) ****-***.794-02-4 – Deutsche Mark account, to an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT.

145.     During this period, when Deutsche bank officials were involved with the above transfer of monies, instead of informing the Sutors of the pending transfer and rather than cooperating with the Sutors, they concealed their actions from the Sutors.

146.     At the suggestions of Credit Suisse, the Sutors enquired of the Swiss Ombudsman about the existence of accounts at Swiss Banks, which would have included Deutsche Bank (Suisse) SA, that were beneficially owned by Dr. Bäuml and his heirs.

147.     Deutsche Bank concealed from the Swiss Ombudsman the existence of accounts that were originally at Credit Suisse that were beneficially owned by Dr. Bäuml and then his heirs, including accounts (i) ****-***-794-01– Swiss Francs account; (ii) ****-***.794-02-1 – US Dollar account; (iii) ****-***.794-02-4 – Deutsche Mark account, to an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT.

148.     The Defendant Banks concealed from the Sutors the December 7, 1992 letter by its counsel Luis Marimón directing the transfer of monies from the Wertheim Family or Dr. Bäuml's secret, numbered, pseudonym and/or beneficially owned accounts at Credit Suisse to account ****12 INT at Deutsche Bank (Suisse) SA, which had been authorized by Diehr and Espinosa.

149.     The Defendant Banks concealed from the Sutors the January 23, 1993 confirmation

of receipt of the transfer of monies from the Wertheim Family or Dr. Bäuml's secret, numbered, pseudonym and/or beneficially owned accounts at Credit Suisse to account ****12 INT.

### J. January 1993 to May 2006 --Efforts by Sutors to Locate and Recover Wertheim Family Assets & Account and Interference by Deutsche Bank

150.     During this period, the Sutors continued to attempt to locate and recover the assets that belonged to The Wertheim Family or Dr. Bäuml's.

151.     In 1999, three additional accounts at Deutsche Bank S.A.E. belonging to Dr. Bäuml were "closed". [16]

152.     From 1993 to present, Deutsche Bank has concealed the existence of the above accounts, the closure of the accounts and any relationship with Dr. Bäuml.

153.     At the suggestions of Credit Suisse, the Sutors enquired of the Swiss Ombudsman about the existence of accounts at Swiss Banks, which would have included all Credit Suisse entities, regarding accounts that were beneficially owned by Dr. Bäuml and his heirs.  *See* **Exhibit 24**. [17]

154.     As of May 2006, Deutsche Bank denied the existence of any banking relationship with the Wertheims, Dr. Bäuml, or any of their companies.

### K. May to September 2006 – Credit Suisse Legal & Compliance Department Officers Sgier and Ribes Disclose Select Documents Confirming Wertheim Family Assets & Accounts at Credit Suisse and Transfer to Deutsche Bank and Deutsche Bank Efforts to Mislead the Heirs

---

[16]  The existence of these accounts was disclosed by Luis Marimón to Julio Mesanza (the Sutors Spanish counsel and President of the Barcelona Bar Association) and the Sutors during a meeting on April 3, 2006 in Barcelona.

[17]  The application to the Ombudsman gave information upon which to search for accounts throughout Switzerland and Lichtenstein, and specifically mentioned Credit Suisse and other banks and accounts in Zug, Zurich, as well as trusts, pseudonym accounts for Wertheim / Vallin / Bäuml.  The transfer from Credit Suisse to Deutsche Bank should have shown up but for Credit Suisse and the Defendant Banks concealment.

155.     In mid to late 2005, the Sutors retained a special investigator – Mrs. Gerda Mangliers – to assist them in their search for the missing accounts, monies and assets that belonged to the Wertheim Family and Dr. Bäuml, and which should have been at Credit Suisse.

156.     The focus on Credit Suisse as the bank at which the Wertheim Family and Bäuml primary accounts were kept was based on reliable evidence.  For example, Credit Suisse was identified by name in the documents that were among the personal effects of Dr. Bäuml, the letters to and from Karl Wertheim, and in the 1956 letter from Maria Wertheim to Credit Suisse directing that Dr. Bäuml be added as having a Power of Attorney of their accounts. Credit Suisse was also named in the diary entries by Dr. Bäuml about his and Maria Wertheim's trips to Credit Suisse in Zurich and Credit Suisse Trust in Vaduz in the 1960s and 1970s, and Dr. Bäuml's own trips to Credit Suisse Zurich in the 1980s.

157.     The Sutors and their investigator, Mrs. Mangliers, ultimately requested assistance from Credit Suisse's Legal & Compliance Department.

158.     The Sutors and Mrs. Mangliers showed Credit Suisse's Legal & Compliance Department the documents showing that Credit Suisse was the "House Bank" for the Wertheims, that there were accounts at Credit Suisse and Credit Suisse Trust; they also expressed the belief that critical information was being concealed from them.

159.     The Sutors and Mrs. Mangliers provided Credit Suisse's Legal & Compliance Department with the following documents: (i) the German Court Order appointing the Sutors as the sole heirs to the Wertheim/Bäuml accounts; (ii) letters showing that in the 1930s Karl Wertheim opened accounts at Credit Suisse's predecessor, Schweizerische Kreditanstalt (SKA); (iii) documents showing that Maria Wertheim was added to the accounts at Credit Suisse; (iv) documents showing that Credit Suisse Trust created the trust and foundation accounts that, among

other things, held the Wertheim Artwork; (v) documents showing that Karl and Maria Wertheim and Dr. Bäuml used the pseudonyms with the names Juan de Pages, Delores de Pages and Manuel de Pages; (vi) documents showing that Credit Suisse and Credit Suisse Trust were involved with the Wertheim companies Hispano Olivetti SA, Hispano Olivetti Office SA, Interwiko AG and/or Intertrade Development & Finance Ltd.; (vii) information about the relationship between Wertheim and Bäuml on the one hand and Don Federico Marimón Griffel and his family on the other hand.

160.    At first in 2006, Credit Suisse's Legal & Compliance officers reported that they could not find any records on the regular Credit Suisse servers of accounts and/or a banking relationship involving the Wertheims, Dr. Bäuml and the Marimón's.

161.    The Sutors and Mrs. Mangliers demanded that Credit Suisse Legal & Compliance Department conduct a full search of all Credit Suisse databases and servers.

162.    Then, in early May 2006, after this broader search was conducted on what the Sutors were told by Credit Suisse's Legal & Compliance Department was a "back server", Credit Suisse's Legal & Compliance Officers Renate Sgier and Marc Ribes informed the Sutors that they had, in fact, found a limited number of documents – many of which had been altered and portions redacted – but which confirmed the existence of the banking relationship between the Wertheims and/or Dr. Bäuml and Credit Suisse. [18]

163.    After finding the documents, Credit Suisse's Legal & Compliance Department officers Sgier and Ribes informed the Sutors and their agent Mrs. Mangliers that the documents were found because the search included reference to the Trustees Don Federico Marimón Griffel's

---

[18]  The search on the backup server was conducted after a tip to Credit Suisse Legal & Compliance Officers by Credit Suisse AG Senior Officer Veit de Maddalena, who was in fact CEO of Credit Suisse Trust AG, and who later became CEO of Rothschild Bank in Zurich.

and his two sons, Federico Marimón Garnier and Luis Francisco Marimón Garnier, who held limited Powers of Attorney over the Wertheim Family/Bäuml accounts.

164.     After finding the documents, Credit Suisse's Legal & Compliance Department officers Sgier and Ribes informed the Sutors and their agent Mrs. Mangliers that the named trustee Luis Francisco Marimón Garnier objected to Credit Suisse's production of documents referencing the accounts with his name even as trustee or holder of limited Powers of Attorney over the Wertheim Family/Bäuml accounts.

165.     After finding the documents, Credit Suisse's Legal & Compliance Department officers Sgier and Ribes informed the Sutors and their agent Mrs. Mangliers that it was the official position of Credit Suisse's Legal & Compliance Department that the rights of the heirs to the account holders or the beneficial owners of accounts were superior to the rights of the Trustee whose name appeared on the accounts and/or who held limited Powers of Attorney over the Wertheim Family/Bäuml accounts.

166.     The documents produced by Credit Suisse on May 11, 2006, proved that: (i) From the death of Griffel until September 1983, Credit Suisse AG was informed and knew that both Federico Marimón and Luis Marimón were given Power of Attorney to help manage the Wertheim Family assets and accounts under the heading of ***794 (*See* Exhibit 11); (ii) On September 26, 1983, Federico Marimón and Luis Marimón (and Dr. Bäuml) met with Credit Suisse AG in Geneva to make the change so that Federico Marimón gave up his power and Luis Marimón alone continued to hold the Power of Attorney to help manage the Wertheim Family assets and accounts under the heading of ***794 (*See* Exhibit 12*)*; (iii) On November 4, 1986, Luis Marimón met with Credit Suisse AG officers in Geneva to confirm that he also held the Power of Attorney to help manage the Wertheim Family debentures, bonds, stocks, precious metals and short-term money

and money market accounts held in Swiss Francs and US Dollars under the heading of ***794 (See Exhibit 13); (iv) On November 16, 1989, Luis Marimón met with Credit Suisse AG officers in Geneva to re-confirm his Power of Attorney Mandate (Identified as NG 76 / 3539) regarding the assets held in the account R.***.***-05 and management of the Wertheim Family general debentures, bonds, stocks, precious metals and short-term money and money market accounts held in Swiss Francs and US Dollars under the heading of ***794 (See Exhibit 14); (v) During the entire period from the 1976 until 1990, Credit Suisse knew that the Wertheim Family Fortune, assets and accounts were held in its bank and included secret/numbered, pseudonym accounts and trustee accounts, including but not limited to the beneficially owned accounts including but not limited to (i) ****-***.794 – master account; (ii) ****-***.794-0; (iii) ****-***-794-01– Swiss Francs account; (iv) ****-***.794-02-1 – US Dollar account; (v) ****-***.794-02-4 – Deutsche Mark account; and (vi)  **** 2238/em (Credit Suisse's internal reference to Wertheim accounts) (See Exhibit 8); (vii) the pseudonyms accounts in the names of Juan de Pages, Delores de Pages and Manuel de Pages; and (viii) the accounts where the beneficial owners included Karl Wertheim a/k/a Carlos Vallin Ballin, Maria Wertheim a/k/a Maria Vallin Ballin, Dr. Ambrosius Wolfgang Bäuml, Hispano Olivetti SA, Hispano Olivetti Office SA, Interwiko AG and Intertrade Development & Finance Ltd.

167.     The documents found and produced by Credit Suisse proved that Deutsche Bank (Suisse) SA, Deutsche Bank S.A.E., Deutsche Bank AG and its other divisions had knowledge that the monies that were transferred, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, were monies that were beneficially owned by the heirs of Bäuml and that the transfer of estate assets / monies was

accepted by Deutsche Bank officials without notifying the estate or the heirs.

168.     The documents found and produced by Credit Suisse on May 11, 2006, proved that Deutsche Bank was involved with (i) misleading the Sutors about the existence of a banking relationship with the Wertheims, Dr. Bäuml and their companies, (ii) the transfer of monies belonging to the estate and (ii) concealment of documents since as early as 1991/1992.

169.     Immediately after receipt of the documents from Credit Suisse Legal & Compliance Officers Sgier and Ribes, the Sutors demanded a meeting with Credit Suisse's Chief Executives.

170.     On September 7, 2006, Credit Suisse AG convened a "tribunal like" meeting at Credit Suisse AG's headquarters in Zurich.  In attendance were (i) the Sutors, Mrs. Mangliers and their counsel and (ii) Credit Suisse's General Counsel for Corporate and Private Clients and General Counsel for Credit Suisse's Executive Board.   At the meeting, Credit Suisse admitted that, with regard to the transfer of monies from the Credit Suisse accounts to the Deutsche Bank account, Credit Suisse acted per the directions of Luis Marimón, General Counsel for Deutsche Bank S.A.E.

171.     Credit Suisse refused to assist the Sutors by providing un-redacted documents or by providing any further documents, and told the Sutors that if they wanted any relief, they should sue the Trustee Luis Marimón or go to Deutsche Bank, which now had the transferred monies.

172.     The Sutors and Mrs. Mangliers challenged Credit Suisse's General Counsel by enquiring as to why the Bank transferred assets to Deutsche Bank based upon the purported authority of a Trustee whose Power of Attorney had expired, and after Credit Suisse was on notice that the beneficial owner of the accounts had died and a new heir to the accounts was appointed by the German Court. Without answering this question, Credit Suisse immediately terminated the meeting and threw the Sutors and Mrs. Mangliers out of their offices.

173.     Following this meeting, Credit Suisse officials notified Deutsche Bank officials of the released documents relating to assets that belonged to the Wertheim/Bäuml heirs.

174.     Also on September 7, 2006, the Sutors and Mrs. Mangliers went to UBS AG to demand records related to the safe deposit box(es) and the corporate holding accounts. At the meeting, General Counsel for UBS AG told the Sutors that they should sue Marimón or go to Deutsche Bank, although the Sutors never mentioned Marimón's or Deutsche Bank's name in relation to the accounts during the meeting.

### L.     The 2006 Credit Suisse Documents

175.     The 2006 Credit Suisse Documents are attached hereto collectively exactly as they were produced.  *See* Exhibit 1.

176.     The 2006 Credit Suisse Documents showed that Credit Suisse held several accounts belonging to Dr. Bäuml, specifically: (i) ****-***.794 – master account; (ii) ****-***.794-0; (iii) ****-***-794-01 – Swiss Francs account; (iv) ****-***.794-02-1 – US Dollar account; (v) ****-***.794-02-4 – Deutsche Mark account; and (vi) **** 2238/em (Credit Suisse's internal reference to Wertheim accounts).  *See* **Exhibit 8**.

177.     In 2006, Credit Suisse Legal and Compliance Officers made a limited production of the documents related to the Wertheim/Bäuml accounts, including (i) the "folder or cover page" to the account records identifying Federico Marimón Garnier and Luis Francisco Marimón Garnier as persons holding mandates regarding the specific Wertheim/Bäuml accounts (*See* **Exhibit 18**); (ii) September 1983 document showing Credit Suisse AG knew that both Federico Marimón and Luis Marimón were given Power of Attorney to help manage the Wertheim Family assets and accounts under the heading of ***794 (*See* **Exhibit 11**); (iii) September 26, 1983 document showing that Federico Marimón and Luis Marimón (and Dr. Bäuml) met with Credit Suisse AG

in Geneva to make the change so that Federico Marimón gave up his power and Luis Marimón alone continued to hold the Power of Attorney to help manage the Wertheim Family assets and accounts under the heading of ***794 ( *See* Exhibit 12); (iv) November 4, 1986 document showing that Luis Marimón met with Credit Suisse AG officers in Geneva to confirm that he also held the Power of Attorney to help manage the Wertheim Family debentures, bonds, stocks, precious metals and short-term money and money market accounts held in Swiss Francs and US Dollars under the heading of ***794 (*See* Exhibit 13); (v) A November 16, 1989 document showing that Luis Marimón met with Credit Suisse AG officers in Geneva to re-confirm his Power of Attorney Mandate (Identified as NG 76 / 3539) regarding the assets held in the account, and management of the Wertheim Family general debentures, bonds, stocks, precious metals and short-term money and money market accounts held in Swiss Francs and US Dollars under the heading of ***794 (*See* Exhibit 14); (vi) 1993 document showing that Luis Marimón instructed Credit Suisse to transfer monies from ****-***-794-01 – Swiss Francs account, ****-***.794-02-1 – US Dollar account and ****-***.794-02-4 – Deutsche Mark account and related to **** 2238/em (Credit Suisse's internal reference to Wertheim accounts) to Deutsche Bank (Suisse) SA for the credit account no. ****12 INT for the attention of Mr. Diehr and Mr. Espinosa (See Exhibit 8) ; (vii) May 11, 2006 letter and cover page fax from Credit Suisse Legal and Compliance Officers Marc Ribes and Renate Sgier to Mrs. Mangliers transmitting a letter clarifying that all the documents given to Mrs. Mangliers and the Sutors on May 9, 2006 related to accounts held or owned or beneficially owned by Dr. Bäuml. *See* **Exhibit 25 & 26.** [19]

178.    The 2006 Credit Suisse Documents confirm that Deutsche Bank (Suisse) SA received a transfer of assets that belonged to the Wertheim/Bäuml heirs and concealed documents

---

[19]  Exhibit 27 is the Cover Folder for the Account documentation.

showing the exact amount of the monies from the Wertheim/Bäuml accounts that were transferred to Deutsche Bank.

**M.**     **Deutsche Bank's Conduct from 1990 to present**

179.    Starting in 1990, Deutsche Bank AG and its subsidiaries were on notice that Dr. Bäuml had died, that a German estate was created, with heirs appointed and the heirs were searching for the estate assets.

180.    Shortly after the death of Dr. Bäuml, the Sutors contacted Deutsche Bank Luxembourg SA.  In September, the Sutors met with the Deutsche Bank Luxembourg employee and this employee confirmed to the Sutors that he had informed Deutsche Bank headquarters in Frankfurt of the demise of Dr. Bäuml and asked them to search for additional accounts owned by Dr. Bäuml within the Deutsche Bank AG branches and other subsidiaries of Deutsche Bank worldwide.

181.    The Sutors were informed by the Deutsche Bank employee in Luxembourg that Deutsche Bank AG told him that they were unable to find any additional accounts owned by Dr. Bäuml other than the accounts already found at Deutsche Bank Luxembourg SA with account number ****60 in the name of Dr. Bäuml.

182.    In response to the notice of Dr. Bäuml's death, the creation of an estate and the appointment of heirs, the Deutsche Bank subsidiary in Luxemburg did the right thing, which was to freeze the assets and later turn the assets over to the heirs of Dr. Bäuml.

183.    In 1991/1992, Deutsche Bank S.A.E. was on notice that Dr. Bäuml had died, that a German estate was created, with heirs appointed and the heirs were searching for the estate assets to the Wertheim / Bäuml.

184.    In 1992/1993, Deutsche Bank (Suisse) SA and its directors and officers Diehr and

Espinosa, were on actual or constructive notice that Dr. Bäuml had died, that a German estate was created, with heirs appointed and the heirs were searching for the estate assets to the Wertheim / Bäuml.

185.    In 1992/1993, Deutsche Bank (Suisse) SA and its directors and officers Diehr and Espinosa, were actively involved in the receipt of monies transferred from Credit Suisse, that were beneficially owned by Dr. Bäuml and which monies belonged to a German estate and the appointed heirs appointed.

186.     From 1992/1993 forward, the Defendant Banks (i) should have assisted the heirs in recovering the monies that were transferred from the Wertheim/Bäuml accounts at Credit Suisse to Deutsche Bank, and (ii) directed that the heirs should be provided a full accounting of all Wertheim/Bäuml monies transferred to the internal account at Deutsche Bank (Suisse) SA and from there to other accounts at one or more of the Deutsche Bank entities.

187.    From 1992/1993 forward, the Defendant Banks (i) should have assisted the heirs in recovering the monies that were transferred from the Wertheim/Bäuml accounts at Credit Suisse to Deutsche Bank, and (ii) directed that the heirs should be provided a full accounting of all Wertheim/Bäuml accounts and assets that were transferred to it, including monies that originated at Credit Suisse.

188.    From 2006 forward, Deutsche Bank (Suisse) SA, Deutsche Bank S.A.E., Deutsche Bank AG and Deutsche Bank Private Wealth Management have had an obligation to assist the Wertheim/Bäuml family heirs, recover and account for the monies that were transferred, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, which monies were known to be beneficially owned by the heirs of

Bäuml

189.    From 2006 forward, Deutsche Bank (Suisse) SA, Deutsche Bank S.A.E., Deutsche Bank AG, Deutsche Bank Private Wealth Management and their Senior Management have refused to assist the Wertheim/Bäuml family heirs in their efforts to recover and account for the monies that were transferred, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml.

190.    From 2006 forward, Deutsche Bank (Suisse) SA, Deutsche Bank S.A.E., Deutsche Bank AG, Deutsche Bank Private Wealth Management and their Senior Management has refused to assist the Wertheim/Bäuml family heirs, in their efforts to recover and account for the monies that were transferred, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml.

**N.    Conduct of Deutsche Bank Chief Executives and Supervisory Board Members from 2012 to present**

191.    In 2012, heirs to the Wertheim/Bäuml estate wrote to each of the members of the Supervisory Board of Deutsche Bank, informing them about the transfer of monies from Credit Suisse accounts to Deutsche Bank (Suisse) SA account # ****12 INT and requested their cooperation in securing the return of and an accounting for their monies.

192.    The heirs requested the members of the Supervisory Boards to investigate and assist the heirs in locating and recovering the transferred funds.

193.    Rather than assisting the heirs regarding the 1993 transfer of monies from Credit

Suisse accounts to Deutsche Bank (Suisse) SA account # ****12 INT, the members of the Supervisory Boards chose to conceal the location of the transferred assets and interfere with the efforts of the heirs to locate and recover the transferred assets.

**FIRST CAUSE OF ACTION**
**(Demand for Return of $ 3 Billion USD, Plus Interest)**
***(against all Defendants)***

194.     Plaintiff repeats, realleges, and incorporates by reference herein the facts and allegations as set forth above in paragraphs 1 through 193.

195.     Plaintiff is an heir to the accounts and monies that were entrusted to Credit Suisse.

196.     Some of the accounts and monies that were originally entrusted to Credit Suisse, including but not limited to monies under (i) account ****-***-794-01 – Swiss Francs account; (ii) account ****-***.794-02-1 – US Dollar account; and (iii) ****-***.794-02-4 – Deutsche Mark account, were or appear to have been transferred to Deutsche Bank (Suisse) SA, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml.

197.     Other accounts and monies that were originally entrusted to Credit Suisse, including but not limited to monies under (i) ****-***.794 – master account; (ii) account - ****-***.794-0; (iii) accounts marked as **** 2238/em (Credit Suisse's internal reference to Wertheim accounts); (iv) general debentures, bonds, stocks, precious metals and short-term money and money market accounts; (v) secret/numbered accounts, pseudonym accounts, and trustee accounts; (vi) accounts under the names of Juan de Pages, Delores de Pages and Manuel de Pages; and (vii) accounts of Carlos Vallin Ballin, Maria Wertheim a/k/a Maria Vallin Ballin, Hispano Olivetti SA,

Hispano Olivetti Office SA, Interwiko AG and Intertrade Development & Finance Ltd.) appear to have been retained at Credit Suisse and there is no record of those monies being transferred.

198.     Approximately $3 billion in assets from the accounts and monies that were originally entrusted to Credit Suisse, including but not limited to monies contained in (i) account ****-***-794-01 – Swiss Francs account; (ii) account ****-***.794-02-1 – US Dollar account; (iii) ****-***.794-02-4 – Deutsche Mark account, that were or appear to have been transferred to Deutsche Bank (Suisse) SA, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml, must be returned to Plaintiff and the heirs of Wertheim/Bäuml, plus interest from 1993.

199.     Other accounts and monies that were originally entrusted to Credit Suisse, including but not limited to monies contained in (i) ****-***.794 – master account; (ii) account -****-***.794-0; (iii) accounts marked as **** 2238/em (Credit Suisse's internal reference to Wertheim accounts); (iv) general debentures, bonds, stocks, precious metals and short-term money and money market accounts; (v) secret/numbered accounts, pseudonym accounts and trustee accounts; (vi) accounts under the names of Juan de Pages, Delores de Pages and Manuel de Pages; and (vii) accounts of Carlos Vallin Ballin, Maria Wertheim a/k/a Maria Vallin Ballin, Hispano Olivetti SA, Hispano Olivetti Office SA, Interwiko AG and Intertrade Development & Finance Ltd.) that have been retained at Credit Suisse must be returned to Plaintiff and the heirs of Wertheim/Bäuml, plus interest from 1993.

200.     Plaintiff demands that Deutsche Bank return the more than $ 3 billion in monies and assets that were transferred to Deutsche Bank (Suisse) SA, with the help and instructions of

Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml and which monies they are holding and which belong to the heirs of Dr. Bäuml.

      **WHEREFORE**, Plaintiff hereby moves this Court for an Order including the following relief:

      a.     An Order directing Deutsche Bank to return the monies that originated with (i) account ****-***-794-01 – Swiss Francs account; (ii) account ****-***-794-02-1 – US Dollar account; and (iii) ****-***-794-02-4 – Deutsche Mark account, which accounts were, or appear to have been, transferred to Deutsche Bank (Suisse) SA account # ****12 INT;

      b.     An order directing that Deutsche Bank tum over all interest and monies earned or retained by them from the account belonging to or beneficially owned by Wertheim/Bäuml that were originally held at Credit Suisse and which were transferred to Deutsche Bank;

      c.     Compensatory damages;

      d.     An award of attorneys' fees and costs of Court; and

      e.     Any further relief this Court deems just and equitable.

**SECOND CAUSE OF ACTION**
**(<u>Accounting</u>)**
***<u>(against all Defendants)</u>***

201.    Plaintiff repeats, realleges, and incorporates by reference herein the facts and allegations as set forth above in paragraphs 1 through 193.

202.    Plaintiff's claims for equitable accounting are based on the fiduciary relationship between the parties, and Plaintiff's remedy at law is inadequate. See *<u>Parliament Ins. Co. v.</u>*

*Hanson*, 676 F.2d 1069, 1072 (5th Cir. Unit B 1982) (applying Florida law); *F.A. Chastain Constr., Inc. v. Pratt*, 146 So.2d 910, 913 (Fla.Dist.Ct.App.1962).

203.     Plaintiff is an heir to the estate of Dr. Bäuml.

204.     There existed and exists a fiduciary relationship between the heirs as successors in interest to the accounts and monies that were originally at Credit Suisse and which were transferred to Deutsche Bank (Suisse) SA, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml.

205.     Deutsche Bank had and has an obligation to Plaintiff as an heir to the Wertheim/Bäuml accounts to account for the monies that were transferred by Credit Suisse to Deutsche Bank (Suisse) SA, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml.

206.     Deutsche Bank refused the request to account for the above monies and accounts.

**WHEREFORE**, Plaintiff hereby moves this Court for an Order including the following relief:

a.     Directing Deutsche Bank (Suisse) SA, Deutsche Bank S.A.E., Deutsche Bank AG and Deutsche Bank Private Wealth Management to provide an Accounting of all monies and/or assets that were originated in Credit Suisse (i) account ****-***-794-01 – Swiss Francs account; (ii) account ****-***.794-02-1 – US Dollar account; and (iii)

****-***.794-02-4 – Deutsche Mark account, that were transferred to Deutsche Bank (Suisse) SA, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml, including (a) all assets belonging to or beneficially owned by the Wertheim Family/Bäuml that were originally held at Credit Suisse and which were transferred to Deutsche Bank, (b) the accounts into which the transferred assets belonging to or beneficially owned by the Wertheim Family/Bäuml were transferred, and (c) the accounts belonging to or beneficially owned by the Wertheim Family/Bäuml that remain at any Deutsche Bank entity;

       b.      Directing Deutsche Bank to tum over (i) all account records for accounts belonging to or beneficially owned by Wertheim/Bäuml that were originally held at Credit Suisse and which were transferred to Deutsche Bank; (ii) all records showing the names on accounts into which the assets belonging to or beneficially owned by the Wertheim Family/Bäuml originally held at Credit Suisse and then transferred to Deutsche Bank; (iii) all records showing the disposition, liquidation or transfer of assets belonging to or beneficially owned by the Wertheim Family/Bäuml originally held at Credit Suisse and then transferred to Deutsche Bank, and/or transferred into any other account or bank;

       c.      Compensatory damages;

      d.      An award of attorneys' fees and costs of Court; and

      e.      Any further relief this Court deems just and equitable.

**THIRD CAUSE OF ACTION**
**(Spoliation of Evidence)**
***(against all Defendants)***

207.    Plaintiff repeats, realleges, and incorporates by reference herein the facts and allegations as set forth above in paragraphs 1 through 193.

208.    At all times relevant hereto, the Deutsche Bank defendants have been under a duty and obligation to preserve all records related to accounts that originated as Credit Suisse accounts (i) ****-***-794-01 – Swiss Francs account; (ii) ****-***.794-02-1 – US Dollar account and (iii) ****-***.794-02-4 – Deutsche Mark account, including records related to the 1993 transfer to Deutsche Bank (Suisse) SA, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml.

209.    At all times relevant hereto, the Deutsche Bank defendants been under a duty and obligation to preserve all records related to accounts that were maintained as numbered, secret or pseudonym accounts, including the accounts involved with the 1993 transfer to Deutsche Bank (Suisse) SA, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml.

210.    The concealment and/or spoliation of evidence by The Deutsche Bank defendants has interfered with and prejudiced Plaintiff's ability to pursue its claims.

211.    The concealment and/or spoliation of evidence has caused damage to Plaintiff and the other heirs by preventing and/or interfering with their ability to track down and recover assets belonging to the Wertheim Family/Bäuml heirs.

**WHEREFORE**, Plaintiff hereby moves this Court for an Order including the following relief:

 a. A Declaratory Judgment and Entry of an adverse finding that the Deutsche Bank defendants' destruction of evidence was intended to interfere with and prejudice the rights of the Wertheim /Bäuml Family and their heirs to recover the more than $3 billion USD in transferred assets;

 b. An Assessment and Award of sanctions and damages to Plaintiff in the amount of $3 billion USD for the Deutsche Bank defendants destruction of evidence related to the 1993 transfer to Deutsche Bank (Suisse) SA, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml;

 c. An Assessment and Award of additional sanctions and damages to Plaintiff in the amount of $1 billion USD for the Deutsche Bank Defendants destruction of evidence related to the 1993 transfer to Deutsche Bank (Suisse) SA, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account

number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml;

        d.      Entry of an Order precluding the Deutsche Bank defendants from offering any exhibits or documents to refute the Plaintiff's estimated value of the more than $ 3 billion dollars USD as the amount of the 1993 transfer to Deutsche Bank (Suisse) SA, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml;

        e.      An award of attorneys' fees and costs of court; and

        f.      Any further relief this Court deems just and equitable.

### FOURTH CAUSE OF ACTION
#### (Declaration of Insolvency of Deutsche Bank AG)
#### *(against Defendant, Deutsche Bank AG)*

212.    Plaintiff repeats, realleges, and incorporates by reference herein the facts and allegations as set forth above in paragraphs 1 through 193.

213.    Florida Law defines a debtor as "insolvent" if the *". . . sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation . . . where a debtor who is generally not paying his or her debts as they become due is presumed to be insolvent"*.  *See* Fla. Stat. 726.103.

214.    Florida law provides that a creditor has various possible remedies, including (i) an action to declare the transfer void to the extent necessary to satisfy the creditor's claim; (ii) an action to attach the assets or other property in possession of the transferee; (iii) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other

property; (iv) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or (v) any other relief the circumstances may require.  See Fla. Stat. 726.108.

215.    Since 2008, Deutsche Bank has engaged in a pattern of misrepresentations, and concealment about its banking activities and its finances.

216.    Since 2008, Deutsche Bank has concealed the truth about its assets, liabilities and true financial condition.

217.    Deutsche Bank has lied and misrepresented to banking regulators in Germany, the European Union and the United States about the extent of its liabilities.

218.    Deutsche Bank has lied to, misled and concealed its ability to conduct normal banking operations according to the requirements as established by regulators in Germany, the European Union and the United States.

219.    Deutsche Bank's net worth and financial stability has been in a steady decline since 2008, the year when Deutsche Bank was partially responsible for the 2008 financial crisis in the United States that crippled the US economy.

220.    In 2007, Deutsche Bank AG share price was above 100.00 USD per share. Presently, Deutsche Bank AG's share price is around 18.00 USD per share, which represents a drop of more than 80 % of its former value.

221.    Regulators around the world have levied billions of dollars (USD) in fines against Deutsche Bank for unlawful conduct. including banking fraud, securities fraud, mortgage fraud, manipulation of interest rates and other crimes.

222.    Deutsche Bank AG is in serious financial crisis, as was Lehman Brothers in 2008, and that a collapse of Deutsche Bank could be worse than Lehman Brothers. [20]

---

[20]    See http://www.express.co.uk/finance/city/714881/Deutsche-Bank-collapse-could-it-be-worse-

223.     Deutsche Bank's financial problems are the result of years of fines amounting to billions of dollars by US and European regulators for, among other things, banking fraud, mortgage fraud, securities fraud, aiding and abetting tax evasion, money laundering, and manipulation of LIBOR rates.

224.     On September 16, 2016, the United States Department of Justice imposed a fine of more than $14 billion against Deutsche Bank AG for its involvement in the 2008 real estate and banking collapse and recession, which Deutsche Bank AG just settled at the end of December 2016 by agreeing to pay $7.2 billion in fines and restitution. [21] [22]

225.     In a study to compare capital needs and leverage of 51 European banks using U.S. Federal Reserve stress test methods, published in July 2016 and conducted by German economic research Institute ZEW led by Finance Professor Sascha Steffen, working with New York University Stern School of Business and the University of Lausanne researchers, Deutsche Bank was found to have "the highest potential capital shortfall of 19 billion euros ($21 billion)" [23].

226.     A report from the International Monetary Fund, published in June 2016, found that Deutsche Bank AG is or may be the biggest contributor to "systemic risk" facing all European

---

Lehman-Brothers-financial-banking-crisis-2008; http://www.dailymail.co.uk/news/article-3810869/Germany-s-banks-timebomb-crash-ll-2008-writes-ALEX-BRUMMER.html; http://cnafinance.com/the-next-financial-crisis-will-come-from-europe/11305; http://www.newyorker.com/business/currency/deutsche-banks-real-time-stress-test; and http://www.forbes.com/sites/francescoppola/2016/09/27/deutsche-bank-a-sinking-ship/#71c8f4933b9b

[21]     See http://www.usatoday.com/story/money/2016/09/16/deutsche-bank-justice-department/90467850/ ; http://fortune.com/2016/09/16/deutsche-bank-doj-mortgages-case/ and https://www.theguardian.com/business/2016/sep/16/deutsche-bank-must-pay-14bn-fine-to-settle-us-mortgage-case

[22]     See http://www.nytimes.com/2016/12/30/business/dealbook/deutsche-bank-flew-and-fell-some-paid-a-high-price.html?mwrsm=Email

[23]     http://www.reuters.com/article/eu-banks-tests-idUSL8N1AQ5AG

banks. [24]

227.    Deutsche Bank's creditworthiness and ability to meet its debts are uncertain.

228.    In view of the foregoing, the appointment of a receiver over Deutsche Bank AG to ensure that Deutsche Bank AG depositors and creditors, such as Plaintiff, are able to ultimately recover what is owed to them is appropriate.

**WHEREFORE**, Plaintiff hereby moves this Court for an Order including the following relief:

  a.    Declaration that Deutsche Bank AG is insolvent;

  b.    Appointment of a receiver of the assets of Deutsche Bank AG in the United States to ensure its payment of its liabilities and debts including the $ 3 billion USD that must be returned to Plaintiff;

  c.    Temporary Injunction or freezing of $ 3 billion USD to prevent Deutsche Bank's efforts to evade or reduce its debt to the Wertheim heirs;

  d.    An award of attorneys' fees and costs of court; and

  e.    Any further relief this Court deems just and equitable.

**FIFTH CAUSE OF ACTION**
**(Declaratory Judgment Directing Production of Foreign Account**
**Information With Which to Comply With FATCA)**
**(against all Defendants)**

229.    Plaintiff repeats, realleges, and incorporates by reference herein the facts and allegations as set forth above in paragraphs 1 through 193.

---

[24]    https://www.bloomberg.com/news/articles/2016-06-30/deutsche-bank-may-be-top-contributor-to-systemic-risk-imf-says

230.   FATCA requires Plaintiff, as a US Taxpayer, to report to the Internal Revenue Service its interest in the more than $ 3 billion USD assets in the accounts that were originally held at Credit Suisse and which were transferred to Deutsche Bank and as well as present information, meaning bank name and account, where the assets are presently held and what is their present value.

231.   In the event Plaintiff fails to make the required disclosure and file the required FATCA form 8938, Plaintiff could be subject to civil fines of $10,000, plus an additional $10,000 for each 30 days of non-filing up to a potential of maximum penalty of $60,000.

232.   FBAR also requires Plaintiff, as a US Taxpayer, to report to the Internal Revenue Service its interest in the more than $ 3 billion USD assets in the accounts that were originally held at Credit Suisse and which were transferred to Deutsche Bank, as well as present information, such as bank name and account, where the assets are presently held and their present value.

233.   In the event Plaintiff fails to make the required disclosure and file the required Civil penalties for failing to disclose and file the required FBAR form ("FinCEN" Form 114), Plaintiff faces possible civil penalties of up to $10,000.

234.   FATCA and FBAR also require The Deutsche Bank Defendants to report to the Internal Revenue Service information regarding the $ 3 billion assets in the accounts that were originally held at Credit Suisse and which were transferred to Deutsche Bank, as well as present information, such as bank name and account, where the assets are presently held and their present value, and in which Plaintiff and various US taxpayers have an interest.

235.   The Deutsche Bank Defendants have refused to provide Plaintiff and the Wertheim/Bäuml heirs with documentation regarding the more than $ 3 billion assets in the accounts that were originally held at Credit Suisse and which were transferred to Deutsche Bank,

and as well as present information, including bank name and account, where the assets are presently held and their present value.

      **WHEREFORE**, Plaintiff hereby moves this Court for an Order including the following relief:

                a.      Directing the Deutsche Bank Defendants to provide all documents in their possession regarding the more than $ 3 billion USD in assets that were originally held at Credit Suisse and which were transferred to Deutsche Bank, as well as present information, such as bank name and account, where the assets are presently held and their present value;

                b.      An award of attorneys' fees and costs of court; and

                c.      Any further relief this Court deems just and equitable.

**SIXTH CAUSE OF ACTION –**
**(Complaint For Pure Bill of Discovery)**
***(against all Defendants)***

    A.  **Authority for Issuance of Complaint for Pure Bill of Particulars**

236.    Plaintiff repeats, realleges, and incorporates by reference herein the facts and allegations as set forth above in paragraphs 1 through 193.

237.    A pure bill of discovery "lies to obtain the disclosure of facts within the defendant's knowledge, or deeds or writings or other things in his custody, in aid of the prosecution or defense of an action pending or about to be commenced in some other court." *Publix Supermarkets, Inc., v. Frazier*, 696 So.2d 1369, 1370-71 (Fla. 4th DCA 1997) (quoting *First Nat'l Bank of Miami v. Dade-Broward Co.*, 171 So. 510, 510-511 (Fla. 1936).

238.    A bill of discovery should demonstrate that "the matters concerning which the discovery asked for is sought, the interest of the several parties and the subject of the inquiry, the

complainant's right to have the relief prayed, its title and interest, and what the relationship of same is to the discovery claim, and that the discovery so attempted to be had is material to the complainant's rights that have been duly brought into litigation on the common-law side of the court under circumstances and entitle the complainant to a disclosure of what is necessary to maintain its own claim in that litigation, and not that of the defendant in the case.  *See Nat'l Bank of Miami*, 171 So.2d at 511.

239.    A bill of discovery "may be used to identify potential defendants and theories of liability and to obtain information necessary for meeting a condition precedent to filing suit".  *See Kaplan v. Allen*, 837 So.2d 1174, 1176 (Fla. 4th DCA 2003).

240.    Identifying potential defendants, identifying theories of liability and gaining information sufficient to determine the manner in which the accident at issue occurred is a proper use of the bill of discovery.  See *Northrop Grumman Corp. v. Swope*, 717 So.2d 213, 213 (Fla. 5th DCA 1998).

241.    Allowing a potential plaintiff to discover facts to assist in the retention of liability experts is a proper use of the bill of discovery.  See *Adventist Health System/Sun Belt, Inc. v. Hegwood*, 569 So.2d 1295, 1296-97 (Fla. DCA 5th 1990).

242.    Florida courts treat bills of discovery as the first step in a civil action and allow such to be amended to state a cause of action at law.  *See Surface v. Town of Bay Harbor Islands*, 625 So.2d 109, 109 (Fla. 3rd DCA 1993); Florida Rule of Civil Procedure 1.040 ("[t]here shall be one form of action to be known as "civil action"); *Perez v. Citibank*, 328 F.Supp.2d 1374, 1378 (S.D. Fla. 2004) (noting that Florida courts consider bills of discovery civil actions and permitting removal of a bill of discovery in part because such can be amended to add substantive causes of action); *APA - The Engineered Wood Ass'n v. Glens Falls Ins. Co., Inc.*, 972 P.2d 937, 562-63

(Wash. App. 1999) (applying Florida law), *review denied*, 989 P.2d 1136 (1999)(absent a bill of discovery mechanism "suit would simply have been the first stage in a suit seeking damages ... [Plaintiffs] could easily have amended the complaint to add a prayer for damages, if and when it deemed its discovery efforts successful.  To hold that [Plaintiffs'] suit was not a suit seeking damages would accentuate the vagaries of Florida procedure, [and] exalt form over substance.").

### B.  Complaint for Pure Bill of Is Appropriate As Against the Deutsche Bank Defendants

243.    A pure bill of discovery "lies to obtain the disclosure of facts within the defendant's knowledge, or deeds or writings or other things in his custody, in aid of the prosecution or defense of an action pending or about to be commenced in some other court." *Publix Supermarkets, Inc., v. Frazier*, 696 So.2d 1369, 1370-71 (Fla. 4th DCA 1997) (quoting *First Nat'l Bank of Miami v. Dade-Broward Co.*, 171 So. 510, 510-511 (1936)).

244.    The Deutsche Bank Defendants are in possession of evidence that Plaintiff needs to pursue further claims against all individuals and entities who are in possession of monies that must be returned to Plaintiff and the heirs of Wertheim Family Fortune.

245.    The Deutsche Bank Defendants are in possession of evidence that Plaintiff needs to determine the exact amount of the monies in the 1993 transfer to Deutsche Bank (Suisse) SA, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml.

246.    The Deutsche Bank Defendants are in possession of evidence that Plaintiff needs in order to determine the exact amount, and all interest earned from 1990 to present, of the monies that were in accounts that were involved in the 1993 transfer to Deutsche Bank (Suisse) SA, with

the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml.

247.    The Deutsche Bank Defendants are in possession of evidence that Plaintiff needs in order to determine the exact accounts, holders of or names on accounts, for monies from the 1993 transfer to Deutsche Bank (Suisse) SA, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at Deutsche Bank (Suisse) SA account number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml, which were transferred to other banks after it was received in the Deutsche Bank (Suisse) SA internal account # ****12 INT.

248.    The Deutsche Bank Defendants are in possession of, among other things, the yet undisclosed evidence related to:

> a.    the meetings that took place in 1992 at Deutsche Bank Spain involving Deutsche Bank, Luis Marimón, the Sutors and their respective counsel related to the accounts at Credit Suisse;
>
> b.    Memoranda, minutes, protocols and other documents related to the accounts at Deutsche Bank Spain that Marimón told the Sutors once existed and belonged to the Wertheim/Bäuml;
>
> c.    the meetings between 1990 and 1993 involving Luis Marimón and Diehr and Espinosa at Deutsche Bank (Suisse) SA regarding the transfer of assets at Credit Suisse to Deutsche Bank (Suisse) SA account # ****12 INT;

d.      Memoranda, minutes, protocols and other documents, including "Know Your Client" documents, that were given to Deutsche Bank (Suisse) SA related to the proposed transfer of assets from Credit Suisse accounts ****-***-794-01 – Swiss Francs account, ****-***.794-02-1 – US Dollar account, and ****-***.794-02-4 – Deutsche Mark account;

e.      Opening account documents, including name, address, purported owner of account, source and/or origin of funds being transferred into account and other "Know Your Client" documents related to Deutsche Bank (Suisse) SA account #****12 INT, into which the proposed transfer of assets from Credit Suisse accounts ****-***-794-01 – Swiss Francs account, ****-***.794-02-1 – US Dollar account, and ****-***.794-02-4 – Deutsche Mark account were to be deposited;

f.      Memoranda, minutes, protocols and other documents related to any account into which the assets received in the January 25, 1993 transfer of assets from Credit Suisse accounts ****-***-794-01 – Swiss Francs account, ****-***.794-02-1 – US Dollar account, and ****-***.794-02-4 – Deutsche Mark account, which were transferred into and/or from Deutsche Bank (Suisse) SA account #****12 INT;

g.      Memoranda, minutes, protocols and other documents given to related to the Powers of Attorney on the above accounts from Credit Suisse that were being transferred to Deutsche Bank (Suisse) SA;

h.      Memoranda, minutes, protocols and other documents related

to meetings and/or communications from 2006 onward involving Deutsche Bank (Suisse) SA, Deutsche Bank AG, Deutsche Bank Spain, Deutsche Bank Wealth Management, Credit Suisse AG, Credit Suisse Trust, the Sutors or any heirs to the Wertheim/Bäuml assets, related to the transfer of monies between August 2, 1990 and January 25, 1993; and

i.    Memoranda, minutes, protocols and other documents related to the conduct by members of Deutsche Bank AG's Supervisory Board and the Chief Executive Officers from 2012 forward after they received personal notices of the transfer of monies from the Wertheim/Bäuml accounts and showing their interference with the rights of the heirs to the Wertheim/Bäuml accounts.

**WHEREFORE**, Plaintiff hereby moves this Court for an Order including the following relief:

(ii)    Directing the Deutsche Bank Defendants to provide all documents in their possession regarding the more than $ 3 billion USD in assets that were originally held at Credit Suisse and which were transferred to Deutsche Bank, as well as present information, such as bank name and account, where the assets are presently held and their present value, which evidence is needed by Plaintiff to pursue further claims against all individuals and entities who are, or may be, in possession of the monies that part of the 1993 transfer to Deutsche Bank (Suisse) SA, with the help and instructions of Deutsche Bank S.A.E. Chief Counsel and Deutsche Bank (Suisse) SA directors Diehr and Espinosa, into an internal account at

Deutsche Bank (Suisse) SA account number account ****12 INT, and which monies were known to be beneficially owned by the heirs of Bäuml and which belonged to the heirs of the Wertheim Family Fortune; and

(iii)    Any further relief this Court deems just and equitable.

## CONCLUSION

Plaintiff prays that this Court grant and enter judgment in its favor and for the relief sought in Plaintiff's First through Sixth Causes of Action, including damages, equitable relief, attorneys' fees, court costs and such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff, Wertheim Jewish Education Trust LLC, hereby demands a trial by jury of all issues so triable.

Respectfully Submitted,

*/s/ Yechezkel Rodal*
Yechezkel Rodal, Esq.
Florida Bar No. 091210
Rodal Law, P.A.
3201 Griffin Road, Suite 203
Dania Beach, Florida 33312
Telephone: (954) 367-5308
Facsimile:  (954) 900-1208
Email: chezky@Rodallaw.com

Kenneth F. McCallion
New York Bar No. 1099241
*Pro Hac Vice Admission Pending*
McCALLION & ASSOCIATES LLP
100 Park Avenue, 16th Floor
New York, NY 10017
Tel.#. (646) 366-0880
Email: kfm@mccallionlaw.com

Counsel for Plaintiff